CHEATHAM v. J. W. BECK COMPANY.

Opinion delivered October 24, 1910.

1. REFORMATION—SUFFICIENCY OF EVIDENCE.—To justify the equitable remedy of reformation, the proof must be clear, unequivocal and decisive. (Page 233.)

2. LANDLORD AND TENANT—SEVERANCE OF RENT FROM REVERSION.—Where a landlord took rent notes for his land, and pledged such notes to a creditor, and subsequently leased the land to another, he will be held to have severed the rent from the reversion, so that the right to collect the rent notes did not pass to the second lessee. (Page 234.)

3. SAME—BREACH OF LEASE—DAMAGES.—Where a landlord leased to A land which he had previously leased to B, A will be entitled

to recover the rental value of the land during the time he was deprived thereof by reason of B's possession under the prior lease. (Page 236.)

Appeal from St. Francis Chancery Court; *Edward D. Robertson*, Chancellor; reversed.

STATEMENT BY THE COURT.

A. W. Cheatham filed his complaint in the St. Francis Chancery Court, alleging his lawful possession of a certain portion of the Linden farm known as the Posey field, under a lease from W. R. Taylor and Rena Taylor to E. W. Arterberry, and prayed an order enjoining the appellee, the J. W. Beck Company, from interfering with his right to peaceably occupy and cultivate said field until dispossessed in manner and form as the law directs, etc.

The J. W. Beck Company answered, also making its answer a cross bill against A. W. Cheatham, R. L. Pettus, W. R. Taylor and Rena Taylor, claiming right to possession of the same premises under a lease from the Taylors dated August 4, 1906, which described the land as follows:

"A tract of land known as the Linden farm is intended to and does include all the lands in cultivation, as well those lands that are now leased to parties to be cleared as those that are now cleared, and especially the lands leased to Joe Meyers and E. W. Arterberry, and also all lands that are suitable to be cleared and put in cultivation."

The answer denied the allegations of the complaint. The cross complaint alleged that Cheatham and Pettus had refused to pay to appellee the annual rent, which had been demanded.

The prayer of the cross bill is for judgment against A. W. Cheatham and R. L. Pettus for two years' use and occupation of the Posey field and Hughes residence, and also for possession of said premises, or, in the event that the lease from the Taylors to Arterberry be held valid, then that the Taylors be required to bring into court the outstanding rent notes executed by it and submit to a credit of $435 for each of five years, etc.

To the cross bill A. W. Cheatham and R. L. Pettus filed their separate answer, denying the claim of the J. W. Beck Company, and claiming the right to use and occupy said premises under a lease from the Taylors to E. W. Arterberry, dated September 2, 1905, and afterwards transferred by Arterberry

to R. L. Pettus. Also claiming that Taylor on September 2, 1905, delivered to Pettus the notes given by Arterberry for annual rent of the land, with directions to collect the notes as they should fall due and credit the proceeds on Taylor's indebtedness to Pettus.

W. R. Taylor and Rena Taylor filed their separate answer to the cross bill, admitting execution of the lease contract to the J. W. Beck Company and setting up the defense that, as both the Arterberry and Myers leases would expire during the life of the lease to Beck Company, "it was expressly agreed between the parties to the lease that the Beck Company should be entitled to the possession and use of the Posey field, the E. C. Hughes residence, the Arterberry lease and the Joe Myers lease, after the expiration of the several leases under which said lands were held," and prayed that the contract be reformed and corrected to conform to the real intention of the parties.

The court adjudged "that the lease contract should not be reformed, and that the defendant, the J. W. Beck Company, is entitled to recover on its cross bill; and that the J. W. Beck Company is entitled to the rent from the Posey field during the life of the Arterbery lease which will expire with the year 1910, and that R. L. Pettus is entitled to the use of the same at a rental of $225 per annum;" that "for the year 1910 the J. W. Beck Company is entitled to the use and possession of the E. C. Hughes residence." Judgment was entered against R. L. Pettus for the possession of the E. C. Hughes residence, also, for $225 per year, or three years, $675 for use of Posey field, with interest $47.64, and aggregating $722.64.

An appeal was granted to all defendants to the cross bill,

*Walter Gorman,* for appellants.

1. Appellee, not having made actual entry into possession either of the Posey field or Hughes residence under their lease from the Taylors, should not maintain this action for use and occupation, or for possession. 18 Am. & Eng. Enc. of L. (2 ed.), 211, 453; 33 N. J. L. 55; 10 N. Y. 479; 91 N. W. 793.

2. When Taylor delivered to Pettus the Arterberry rent notes with directions to collect same and apply the proceeds to the credit of Pettus' debt against the Taylors, the notes became a pledge or collateral security for so much of their debt to

Pettus, conferring upon him a special property in the notes, a right to their possession and a lien upon the proceeds which was paramount to the rights of other creditors, purchasers or assignees of the Taylors.   38 Ark. 285; 49 S. W. 541.

*Norton & Hughes,* for appellee.

Where a landlord leases land and afterwards conveys it without reservation, his right to the rent passes to the purchaser, and the tenant must attorn to him.   10 Ark. 9.   Likewise, if he leases to one party for a term, and afterwards, while this lease is unexpired, makes a second, or "over-lease," to another party for a longer term, the second lessee is considered as a grantee of the reversion, and is entitled to the rents agreed to be paid by the first lessee.   18 Am. & Eng. Enc. of L., 283; 1 Tiffany, Landlord and Tenant, 872.

The landlord may dispose of accruing rents to one person and of the reversion to another who may be either a grantee or second lessee.   1 Tiffany, Landlord and Tenant, 1105, *et seq.*

*Walter Gorman,* for appellants in reply.

To render an over-lease effective as a grant of the reversion, there must be an attornment by the first lessee to the second lessee, otherwise the latter acquires only an *interesse termini.*   L. R. 1 Eq., 403; 4 Coke, 52.   It appears by the testimony that the rent was severed from the reversion long before the date of appellee's lease.   76 Ala. 298; 90 N. C. 245; 71 Ill. App. 309; 1 Tiffany, Landlord and Tenant, 1107, and authorities cited; 133 Mich. 617; 34 Mich. 292; 113 Mich. 449.

WOOD, J., (after stating the facts).   1.   The lease shows, in language unmistakable, that the parties to it intended to include the lands leased to E. W. Arterberry.   For the language is:   "And especially the lands leased to Joe Myers and to E. W. Arterberry."   It is uncontroverted that the lands leased to E. W. Arterberry constituted what is designated as the Posey field and the Hughes residence, the same being portions of the Linden farm.   To justify the equitable remedy of reformation, the proof must be "clear, unequivocal and decisive."   *McGuigan* v. *Gaines,* 71 Ark. 614; *Goerke* v. *Rodgers,* 75 Ark. 72; *Davenport* v. *Hudspeth,* 81 Ark. 166.   See also *McCracken* v. *McBee, post* p. 251.   It is not so here.

The evidence as to the intention of the parties, aside from

the written memorial, is very conflicting. The witnesses who negotiated the lease on the part of appellee are positive in their testimony that the lands in the Arterberry lease were to be included in the lease under consideration as that lease recites, and that the lease as to these lands began from the date of the lease. The testimony of W. R. Taylor, who made the lease for the Taylors, is equally as positive that the parties did not intend that the lease should begin as to the lands in the Arterberry lease until that lease had expired.

Stress in argument of counsel for appellants is laid upon the fact that the witness representing appellee in making the lease stated that the company did not take possession of the land held by Myers included in the present lease until the expiration of his prior lease. Counsel argue that, as the Myers lease and the Arterberry lease were governed by precisely the same clause in the lease under consideration, the fact that appellee did not take possession or claim compensation for the lands leased by Myers until his lease expired showed that the intention of the parties was not to have compensation for or to take possession of the lands in the Arterberry lease until the expiration of such lease. But the argument has no force, for the reason that Myers was to have the use of the land leased by him without any rent charge. He was to use, free of rent, the land that he cleared, whereas the lands were leased by Arterberry at an annual rental of $225. It was worth while for appellee to claim the Arterberry lease; not so the lease to Myers. Arterberry was to pay rent; Myers was not. The Taylors contend that the lease should be reformed so as to read as follows: "Especially the lands leased to Joe Myers and to E. W. Arterberry, from and after the expiration of the two leases under which said lands are now held." The court did not err in refusing to reform the lease.

2. We are of the opinion that a preponderance of the evidence shows that before the lease under consideration was executed the Taylors, lessors, had severed the rent of the lands in the Arterberry lease from the reversion. W. R. Taylor delivered the notes executed by Arterberry for the rent of the land occupied by him to R. L. Pettus, and directed him to collect the notes and to give the Taylors credit for the amount on their account. This transfer was made on the 2d of September.

1905, the day the notes were executed. The Taylors at the time were indebted to Pettus in an amount greatly in excess of the Arterberry notes. The deposit of these notes with Pettus to be held by him as collateral security for his debt against the Taylors constituted him in equity the legal owner and holder thereof for the purpose indicated. Therefore Pettus was entitled to the amount of these rent notes.

Witnesses on behalf of appellee testified that when W. R. Taylor was showing them the Linden farm with the view of leasing same to appellee, he said that appellee would get the Arterberry rent. Taylor at that time did not refer to the rent notes, but when he executed the lease to appellee, August 4, 1906, he said that the rent notes given by Arterberry were at R. L. Pettus's, and that he would get them and turn them over to appellee. W. R. Taylor, on behalf of appellants, testified that when the Posey field or Arterberry lease was mentioned he told the agents of appellee that Arterberry had a lease on the Posey field, and that R. L. Pettus had the notes to collect. He testified "that he at no time promised to get the Arterberry notes from Pettus and deliver them to the appellee." He says: "I made no such statement, and could not have done so, because I had in good faith turned over the Arterberry notes to Pettus for collection and credit on my account, and it was out of my power." Pettus testified that the notes were left with him by W. R. Taylor with directions to collect and apply on account, and that he credited the four years' rent, $900, as directed by Taylor. It was in evidence that the appellee paid the annual rental of $2,700 for the three years, 1907, 1908 and 1909, by crediting the account of Taylor with the entire amount of the rent for those years, and had not demanded from Taylor the Arterberry notes, and had not charged back or demanded any deduction from their annual rental of $2,700 on account of the Arterberry rent which it did not get. While the evidence is conflicting, in our opinion the decided preponderance is in favor of the finding that the Taylors had severed the rent from the reversion, before the lease under consideration was executed, by transfering the notes given by Arterberry for the rent of the Posey field and Hughes place to appellant Pettus. "A severance of the rent from the reversion takes place, not only when the landlord transfers the reversion without the rent, but also when he

transfers the rent without the reversion." 1 Tiffany's Landlord and Tenant, page 1107, and authorities cited in note.

It follows that the court erred in rendering judgment against Pettus for the rents in controversy. As between Pettus and appellee, the rents belong to Pettus. The court also erred in rendering judgment for possession of the Hughes residence for the year 1910. The Arterberry lease did not expire until the end of the year 1910, and Pettus held under that lease.

3. The Taylors included in their lease to appellee lands that had been previously rented to Arterberry. These lands were a part of the consideration of the lease between the Taylors and appellee. The appellee failed to get what its contract called for, and this was through no fault of appellee, but was the fault of the Taylors. The fact that appellee paid the full amount of the rents according to its contract for the years, 1907, 1908 and 1909, without abatement on account of a failure to get the Arterberry lands, was no waiver of their right to those lands or their rental value. The fact that appellee pursued a wrong remedy in an attempt to collect rents was no waiver of its right against the Taylors. The rental value of the lands which the Taylors rented to appellee, and which it did not get, was shown to be $225 per annum. That was a part of the consideration of the lease contract between the Taylors and appellee, and the Taylors had placed it beyond the power of appellee, as we have seen, to occupy the land or to collect the rents therefrom for the years, 1907-1910. To that extent the Taylors have failed to comply with their contract with appellee, and the latter is justly entitled to a decree against them for the rental value of the lands in the Arterberry lease for those years. Since the Taylors are not entitled to a reformation of the lease contract, it logically follows that appellee is entitled to judgment against them for the rental value of the land which they leased to it, but which it did not get.

The judgment will therefore be reversed with directions to dismiss the cross complaint as to Pettus, and to enter judgment in favor of appellee against the appellants, the Taylors, in the sum of $900.